Argued July 13, reversed with instructions October 13, 1967,
former opinion modified, petition for rehearing
denied February 21, 1968

SAVAGE, *Respondent and cross appellant, v.*
PETER KIEWIT SONS' CO., *Respond-*
*ent,* STATE HIGHWAY COMMIS-
SION, *Appellant and cross*
*respondent.*
432 P. 2d 519
437 P. 2d 487

148

*Alan H. Johansen,* Assistant Attorney General, Salem, argued the cause for appellant and cross respondent. On the briefs were Robert Y. Thornton, Attorney General, G. E. Rohde, Assistant Attorney General and Chief Counsel for Oregon State Highway Commission, and J. Robert Patterson, Assistant Attorney General, Salem.

*Bruce M. Hall,* Portland, argued the cause for respondent and cross appellant Savage. On the brief were Bonyhadi & Hall, Portland.

Cleveland C. Cory, Portland, filed a brief for respondent Peter Kiewit Sons' Co.

Before PERRY, Chief Justice, and SLOAN, GOODWIN, DENECKE and LUSK, Justices.

GOODWIN, J.

■ The Oregon State Highway Commission appeals from a declaratory decree allowing compensation to a subcontractor for extraordinary expenses incurred in performing his contract. As this suit was tried below as a suit in equity, we have considered the record *de novo* pursuant to ORS 19.125 (3).

The defendant Kiewit was the prime contractor with the Highway Commission for the construction of the West Marquam Interchange on Interstate Five in Multnomah County. The plaintiff, Savage, subcontracted with Kiewit for the cleaning and painting of the structural steel used in the interchange.

The contract between the Highway Commission and Kiewit provided for all structural steel to be cleaned by sandblasting, either (1) in the steel supplier's shop, (2) on the ground at the bridge site, or (3) in the air after erection. Savage elected to sandblast in the air, which witnesses agreed was the most economical method, and computed his bid accordingly. Savage had concluded after inspecting the site that, with certain precautions, the open-air method could be used without undue damage to nearby businesses.

After the steel was in place and the other optional methods were thus precluded, Savage began the sandblasting. He proceeded without difficulty until a complaint of damage from falling sand was made by Alaska Steel Co., a concern which operated machinery under the work area. Savage then commenced to take the precautions which, he testified, he had anticipated probably would be necessary. These consisted of pro-

viding covers for Alaska Steel's equipment, working on weekends, and working only when the winds were favorable. Despite Savage's precautions, Alaska Steel continued to complain that sand particles were damaging its machinery, and on June 3, 1965, obtained a permanent injunction against further sandblasting above its land.

After the injunction was decreed, the Highway Commission asked Savage to conduct tests of cleaning methods other than sandblasting. During the tests, Savage received from the bridge engineer and from the assistant state highway engineer conflicting advice as to his duties under his contract. Confused by these communications, Savage commenced a suit for declaratory relief on July 1, 1965. Between the filing of this suit and the hearing thereof, the Commission again advocated some variation of the open-air sandblasting method. Savage and Kiewit then devised an enclosed structure, a sort of movable cocoon, which could be rolled along the spans and which was designed to contain the sand particles.

After the hearing of the declaratory proceeding, the trial court concluded that Savage's original obligation to perform his contract with Kiewit had been discharged by impossibility (Alaska Steel's injunction). The court then treated the Commission's urging that Savage proceed by the newly devised method as an alteration of the original contract, and ordered Savage to finish the sandblasting on a *quantum meruit* basis. The Commission had been urging Savage to proceed, and had helped to have the existing injunction modified to permit him to do so, but the Commission vigorously opposed the portion of the declaratory decree which ordered Savage's compensation on a *quantum meruit* basis.

The Commission's appeal contends that Kiewit was bound to deliver for the contract price a finished product according to contract specifications, and that the injunction which prevented the completion of Savage's subcontract as planned did not constitute a legal excuse for nonperformance nor create a right to extra compensation.

Savage contends that the injunction constituted a supervening event which made his performance impossible and thereby excused him from performance, citing 6 Corbin, Contracts § 1320, at 323 (1962). Supervening impossibility occurs "where, after the formation of a contract facts that a promisor had no reason to anticipate, and for the occurrence of which he is not in contributing fault, render performance of the contract impossible, the duty of the promisor is discharged, unless a contrary intention has been manifested * * *." Restatement of Contracts § 457 (1932). Included as one of the supervening events which in a proper case may excuse performance is prohibition by a court order. Restatement of Contracts § 458 (1932); Annotation, 84 ALR2d 12, 46 (1962).

Cases dealing with impossibility caused by court order frequently speak of situations where an injunction prevents all performance, but this is not really what happened to Savage. He was eventually able to complete his promised sandblasting, but to do so he had to spend more money than he had planned on spending to protect third persons. The alleged impossibility in this case arises out of increased expense in complying with court orders.

In applying the doctrine of impossibility, courts recognize that unexpected difficulty or expense may approach such an extreme that a practical impossibility exists. See, e.g., *Natus Corporation v.*

*United States,* 371 F2d 450 (Ct Cl 1967). To operate as a discharge, however, the hardship must be so extreme as to be outside any reasonable contemplation of the parties. *Natus Corporation v. United States,* supra. And see Restatement of Contracts § 454 (1932); *Transatlantic Financing Corporation v. United States,* 363 F2d 312, 315 (DC Cir 1966).

Unexpected difficulties and expense, therefore, whether caused by injunction or by other causes, do not necessarily excuse performance of a contract. The question is whether the unforeseen hazard was one that reasonably should have been guarded against. One purpose of a contract is to shift reasonably foreseeable business risks to the party promising the performance so that the promisee can devote his energies and capital to other matters. A mere showing of commercial unprofitability, without more, will not excuse the performance of a contract. *Learned v. Holbrook,* 87 Or 576, 170 P 530, 171 P 222 (1918).

Returning to the Restatement limitations upon the excuse of impossibility (Contracts § 457), we need not search for contributing fault on the part of Savage. Whatever liabilities Savage may have incurred toward Alaska Steel, it is not necessary in this case to assign fault as a basis thereof. We assume for the purpose of this case that Savage did his pre-injunction sandblasting with reasonable care but that notwithstanding such care his operations caused harm to a nearby landowner and had to be drastically modified in order to avoid such harm.

The trial court found that "the situation which developed was beyond the contemplation and experience of all the parties to this case." The important question, however, is whether Savage should have anticipated the danger of serious harm to nearby

landowners. Perhaps Savage should not have been expected to anticipate that his work might be enjoined, since he had no previous experience with injunctions. But, putting the question more generally, it does not seem unreasonable to say that Savage should have anticipated that he might have to take out-of-the-ordinary precautions to avoid damage to businesses near the work area. Savage was in the sandblasting business, and assessing the risk of damage to third parties from his work appears to be within the scope of his expertness.

The argument was made that Savage should have been entitled to rely on the safety of all three methods approved by the Commission, and had no duty to anticipate unusual difficulty. *United States v. Spearin,* 248 US 132, 39 S Ct 59, 63 L Ed 166 (1918), furnishes some support for such an argument, with its holding that the government impliedly warrants that the specifications it furnishes contractors will be adequate for producing the desired result. But the situation where a contractor encounters extra costs after relying on incorrect government specifications presents a far stronger case against the government than does the instant case, where the Commission deferred to the judgment of the contractor as to which of the authorized methods he would use in computing a bid.

That Savage was allowed to choose between alternative methods of performance strengthens the conclusion that he should have anticipated the risks inherent in the chosen method. The inclusion of two more expensive yet safer alternatives could have put the bidder on notice that the cheapest method may not have been the safest one. There is, however, some authority for requiring the government to warn the

bidders expressly about certain kinds of hazards rather than merely to provide safer alternatives. *Helene Curtis Industries, Inc. v. United States,* 312 F2d 774 (Ct Cl 1963), held that the government was under a duty to disclose to persons bidding to manufacture a product that the normal methods for manufacturing such products probably would not work. Because the government failed to disclose its superior knowledge, a bidder was allowed to recover the extra cost of performing the contract by other than normal production methods. The difficulty of applying the *Helene Curtis* principle to the case before us is that Savage was in as good a position to gauge the risks as was the Commission. *Helene Curtis* involved a new product with which only the government had had experience. Savage, however, could be expected to know at least as much about the dangers of sandblasting as could anyone in the Highway Commission.

Because of the competitive nature of the bidding, one could also argue, as Savage did, that the bidders felt they had no real choice other than the cheapest option if they wanted the job. It was thus argued that in effect the state was asking for bids based upon the open-air method only. If the options were truly illusory, Savage's choice of the only available method would not point so strongly to the conclusion that he should have anticipated the dangers of the cheaper method. This argument loses some of its impact, however, because the record shows that the contractor who painted the main span of the same bridge elected to have his sandblasting done in the shop.

In addition to Savage's failure fully to anticipate the dangers of open-air sandblasting, it appears that he expressly assumed the risk of having to take all

necessary precautions to avoid damage to third parties. The contract between Kiewit and Savage expressly placed liability for such damage on Savage. It is true that Savage had no choice whether to assume the damage risks or not, but he did have the choice of naming the price at which he would assent to Kiewit's (and the Commission's) terms. Thus, the contract differed from the most objectionable kind of adhesion contract where one party must assent to all the other's terms because he has no alternative. In a construction contract there is no injustice in requiring a subcontractor to be responsible for damage caused by his work. He is the one who controls how the work is done. Such a provision in a contract is a common one.

While assuming the risk of paying damage claims resulting from one's performance is somewhat different from assuming the risk of having the performance enjoined because of the damage caused, the difference is essentially one of degree. Savage expected to incur certain costs in the event of damage to third parties, but he ultimately had to pay more than he expected.

If the damage leading to the injunction had been of a totally unexpected character, then Savage's argument would be more appealing. But here the alleged damage was exactly what any sandblasting contractor could expect from sand getting into a neighbor's machinery. If Savage had been required merely to pay for ruining an expensive machine belonging to Alaska Steel he clearly could not shift the added expense to Kiewit or to the Commission. He is in no better position when, because of the continuity and unmeasurability of the damage he was causing, an injunction

rather than damages resulted from his performance. The risk of damage to third parties is one of the costs, albeit an uncertain one, which the bidder must consider in computing his bid. Thus, we hold that Savage assumed the risk of consequences resulting from damage to third parties, and he is not entitled to be relieved merely because the degree of such damage was greater than he expected.

An argument was made by Savage that the Commission's conduct in causing the injunction to be modified and in urging him to complete the project somehow amounted to an implied promise to pay any extra costs incurred in completing the job. There was no trial court finding on this point, and the record is insufficient to support such a conclusion. Despite urging Savage to complete the job by the new method, the Commission repeatedly told Savage that he would not be paid extra compensation and that his contract bound him to complete the project no matter what it cost. The Commission's efforts to modify the injunction were entirely in its own interest, since once the injunction was modified Savage could no longer contend literally that his performance was impossible.

The Commission has presented a number of assignments of error in addition to its principal argument that the contractors were bound to finish the job as contracted regardless of cost to them. Since we conclude that the additional expenses incurred in order to eliminate the damage to third persons which had brought about the injunction were not expenses that legally could be charged to the Commission, it is not necessary to discuss the other assignments.

Reversed with instructions to enter a decree dismissing the complaint, without costs to either party.

*Bruce M. Hall* and Bonyhadi & Hall, Portland, for the petition.

*Cleveland C. Cory,* Portland, contra.

Before PERRY, Chief Justice, and SLOAN, O'CONNELL, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

GOODWIN, J.

In the opinion reversing the declaratory decree in this case we instructed the trial court to dismiss the complaint, without costs to either party. In a petition for rehearing, the plaintiff has pointed out that it was not necessary to dismiss the plaintiff's complaint insofar as it may have asserted claims against the defendant Peter Kiewit Sons' Co. We did not intend to pass upon the merits of any disputes that may exist between the plaintiff and Kiewit, because such questions were not before us on appeal. The trial court had granted the plaintiff relief against Kiewit and the Highway Commission, and had granted Kiewit relief against the Commission. We held that the Commission was not liable either to the plaintiff or to Kiewit.

Some of the language of the trial court's findings

---

See effect of partial reversal of judgment.
5 Am Jur 2d, Appeal and Error §§ 949, 950.

and conclusions touched upon issues between the plaintiff and Kiewit, but these views were premised upon the trial court's belief that both the plantiff and Kiewit were entitled to recover against the Highway Commission. As that assumption was held to be in error, the rights of the remaining parties between themselves, if any, must be determined with the Commission out of the case.

The mandate should provide that the proceedings against the Oregon State Highway Commission be dismissed without prejudice to the rights of the remaining parties. The cause is remanded for further proceedings to resolve any issues remaining to be litigated between the plaintiff and the defendant Kiewit.

Former opinion modified; petition for rehearing in all other respects denied.